FILED
2023 Mar-15  AM 11:17
U.S. DISTRICT COURT
N.D. OF ALABAMA

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| SHARON MCNEES, | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| vs. | ) | Case No.   2:21-cv-01185-HNJ |
| | ) | |
| SOCIAL SECURITYADMINISTRATION, | ) | |
| COMMISSIONER, | ) | |
| | ) | |
| Defendant | ) | |

## MEMORANDUM OPINION

Plaintiff Sharon McNees seeks judicial review pursuant to 42 U.S.C. § 405(g) of an adverse, final decision of the Commissioner of the Social Security Administration ("Commissioner"), regarding her claim for a period of disability and disability insurance benefits. The undersigned carefully considered the record, and for the reasons expressed herein, **AFFIRMS** the Commissioner's decision.[1]

## LAW AND STANDARD OF REVIEW

To qualify for benefits, the claimant must be disabled as defined by the Social Security Act and the Regulations promulgated thereunder. The Regulations define "disabled" as the "inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result

---

[1] In accordance with the provisions of 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73, the parties have voluntarily consented to have a United States Magistrate Judge conduct any and all proceedings, including the entry of final judgment. (Doc. 10).

in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a). To establish an entitlement to disability benefits, a claimant must provide evidence of a "physical or mental impairment" which "results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3).

In determining whether a claimant suffers a disability, the Commissioner, through an Administrative Law Judge (ALJ), works through a five-step sequential evaluation process. *See* 20 C.F.R. § 404.1520(a)(4). The burden rests upon the claimant at the first four steps of this five-step process; the Commissioner sustains the burden at step five, if the evaluation proceeds that far. *Washington v. Comm'r of Soc. Sec.*, 906 F.3d 1353, 1359 (11th Cir. 2018).

In the first step, the claimant cannot be currently engaged in substantial gainful activity. 20 C.F.R. § 404.1520(b). Second, the claimant must prove the impairment is "severe" in that it "significantly limits [the] physical or mental ability to do basic work activities . . . ." *Id.* at § 404.1520(c).

At step three, the evaluator must conclude the claimant is disabled if the impairments meet or medically equal one of the listed impairments. *Id.* at § 404.1520(d). If a claimant's impairment meets the applicable criteria at this step, that claimant's impairment would prevent any person from performing substantial gainful

2

activity. 20 C.F.R. §§ 404.1520(a)(4)(iii), 404.1525. That is, a claimant who satisfies steps one and two qualifies automatically for disability benefits if the claimant suffers a listed impairment. *See Williams v. Astrue,* 416 F. App'x 861, 862 (11th Cir. 2011) ("If, at the third step, [the claimant] proves that [an] impairment or combination of impairments meets or equals a listed impairment, [the claimant] is automatically found disabled regardless of age, education, or work experience.") (citing 20 C.F.R. §§ 404.1520, 416.920; *Crayton v. Callahan*, 120 F.3d 1217, 1219 (11th Cir. 1997)).

If the claimant's impairment or combination of impairments does not meet or medically equal a listed impairment, the evaluation proceeds to the fourth step, where the claimant demonstrates an incapacity to meet the physical and mental demands of past relevant work. 20 C.F.R. § 404.1520(e). At this step, the evaluator must determine whether the claimant has the residual functional capacity ("RFC") to perform the requirements of past relevant work. *See id.* § 404.1520(a)(4)(iv). If the claimant's impairment or combination of impairments does not prevent performance of past relevant work, the evaluator will determine the claimant is not disabled. *See id.*

If the claimant succeeds at the preceding step, the fifth step shifts the burden to the Commissioner to provide evidence, considering the claimant's RFC, age, education and past work experience, that the claimant is capable of performing other work. 20 C.F.R. §§ 404.1512(b)(3), 404.1520(g). If the claimant can perform other work, the evaluator will not find the claimant disabled. *See id.* § 404.1520(a)(4)(v); *see also* 20

3

C.F.R. § 404.1520(g).   If the claimant cannot perform other work, the evaluator will find the claimant disabled.   20 C.F.R. §§ 404.1520(a)(4)(v), 404.1520(g).

The court must determine whether substantial evidence supports the Commissioner's decision and whether the Commissioner applied the proper legal standards.   *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1178 (11th Cir. 2011).   The court reviews the ALJ's "'decision with deference to the factual findings and close scrutiny of the legal conclusions.'"   *Parks ex rel. D.P. v. Comm'r, Social Sec. Admin.*, 783 F.3d 847, 850 (11th Cir. 2015) (quoting *Cornelius v. Sullivan*, 936 F.2d 1143, 1145 (11th Cir. 1991)).   Indeed, "an ALJ's factual findings . . . 'shall be conclusive' if supported by 'substantial evidence.'"   *Biestek v. Berryhill*, 139 S. Ct. 1148, 1153 (2019) (citing 42 U.S.C. § 405(g).   Although the court must "scrutinize the record as a whole . . . to determine if the decision reached is reasonable . . . and supported by substantial evidence," *Bloodsworth v. Heckler,* 703 F.2d 1233, 1239 (11th Cir. 1983) (citations omitted), the court "may not decide the facts anew, reweigh the evidence, or substitute [its] judgment" for that of the ALJ.   "[W]hatever the meaning of 'substantial' in other contexts, the threshold for such evidentiary sufficiency is not high. . . .   Substantial evidence . . . . is 'more than a mere scintilla,' . . . [and] means – and means only – 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"   *Biestek*, 139 S. Ct. at 1154 (citations omitted). Therefore, substantial evidence exists even if the

4

evidence preponderates against the Commissioner's decision.  *Moore v. Barnhart*, 405 F.3d 1208, 1211 (11th Cir. 2005).

## FACTUAL AND PROCEDURAL HISTORY

Ms. McNees, age 50 on her alleged disability onset date and age 52 at the time of the ALJ's decision, filed an application for a period of disability and disability insurance benefits on February 21, 2019, alleging disability as of December 14, 2018.   (Tr. 17, 30, 306-07).

The Commissioner initially denied McNees's claims on May 20, 2019, and McNees timely filed a request for hearing on June 3, 2016.   (Tr. 96-119, 145-53).   The Administrative Law Judge ("ALJ") held a hearing on April 30, 2020, at which McNees appeared unrepresented (Tr. 62-95), and the ALJ issued an opinion on May 11, 2020, denying McNees's claim.   (Tr. 120-38).   McNees engaged an attorney and appealed that decision (Tr. 198-232).   On October 15, 2020, the Appeals Council remanded the claim to the ALJ to include a full evaluation of the record medical opinions; carefully proofread the opinion to ensure it does not omit any language; re-evaluate McNees's RFC, provide rationale for the finding with specific record citations, and discuss the prior medical and administrative findings; further evaluate McNees's symptoms; and obtain supplemental vocational evidence, if warranted.   (Tr. 139-44).

The same ALJ conducted a second hearing on March 30, 2021 (Tr. 40-61), and on April 19, 2021, he issued a second decision, again denying McNees's claim.   (Tr. 17-

32).   Applying the five-step sequential process, the ALJ found at step one that McNees did not engage in substantial gainful activity since December 14, 2018, the alleged onset date.  (Tr. 23).   At step two, the ALJ found McNees manifested the severe impairments of chronic urinary tract infections, degenerative disc disease of the cervical spine, anxiety, depression, and wrist fracture.   (Tr. 23).   At step three, the ALJ found that McNees's impairments, or combination of impairments, did not meet or medically equal any impairment for presumptive disability listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.   (*Id*.).

Next, the ALJ found McNees exhibited the residual functional capacity ("RFC")

> to perform light work as defined in 20 CFR 404.1567(b) except frequent reaching, handling, and fingering, however, the claimant can occasionally reach overhead; frequently climb ramps; occasionally climb stairs, but never ladders, ropes, or scaffolds; the claimant can frequently balance and stoop; occasionally kneel and crouch, but never crawl.  The claimant should avoid concentrated exposure to extreme cold and vibrations, and she should never work at unprotected heights, or with or near dangerous machinery and equipment.  The claimant must never operate a motorized vehicle as a work requirement.  The claimant can perform simple goal oriented tasks, no production rate pace, tasks shall be more individualized in natures [*sic*] rather than requiring teamwork/collaborative effort.  She can understand and follow simple routine role instructions, make simple routine decisions, and can have work related contact as follows: supervisors frequently, coworkers occasionally; and the public occasionally.  The claimant can tolerate occasional changes in the work place setting that are gradually introduced.  She should have two or three monthly brief redirections at the workstation lasting five minutes or less; with no more than one occurrence on any given workday.

(Tr. 24-25).

6

At step four, the ALJ determined McNees could not perform her past relevant work as a legal secretary.   (Tr. 30).   However, at step five, the ALJ determined McNees could perform a significant number of other jobs in the national economy considering her age, education, work experience, and RFC.   (*Id.*).   Accordingly, the ALJ determined McNees has not suffered a disability, as defined by the Social Security Act, since December 14, 2018.   (Tr. 31).

McNees timely requested review of the ALJ's decision.   (Tr. 300-02).   On July 1, 2021, the Appeals Council denied review, which deems the ALJ's decision as the Commissioner's final decision.   (Tr. 1-3).   On August 30, 2021, McNees filed her complaint with the court seeking review of the ALJ's decision.   (Doc. 1).

## ANALYSIS

In this appeal, McNees argues the ALJ improperly evaluated her subjective symptoms and improperly considered her treating psychologist's opinion.   For the reasons discussed below, the undersigned concludes those contentions do not warrant reversal.

## I.   The ALJ Properly Considered the Opinion of McNees's Treating Psychologist

The court first considers whether the ALJ properly considered the opinion of Julie S. Kline, Psy.D., McNees's treating psychologist.[2]

---

[2] Both parties' briefs characterize Kline as McNees's psychiatrist, but Kline signed the form "Julie E.

On January 18, 2017, the Commissioner revised the regulations governing the assessment of medical opinion evidence for claims filed on or after March 27, 2017. *See* Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844, 5867 (Jan. 18, 2017) (codified at 20 C.F.R. § 404.1520c).   McNees's claims, filed on March 30, 2018, fall under the revised regulations.

Pursuant to the revised regulations, the ALJ "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [the claimant's] medical sources."   20 C.F.R. § 404.1520c(a).   The ALJ must apply the same factors in the consideration of all medical opinions and administrative medical findings, rather than accord specific evidentiary weight to any particular provider's opinion.   *Id.*

Supportability and consistency constitute the most important factors in any evaluation, and the ALJ must explain the consideration of those factors.   20 C.F.R. § 404.1520c(b)(2).   Thus, "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s)," and "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources[,] the more persuasive the medical

---

Kline, Psy.D.," indicating she worked as a psychologist, not a psychiatrist.

opinions or prior administrative medical finding(s) will be." 20 C.F.R. § 404.1520c(c)(1)-(2).

The ALJ also may consider the medical source's specialty and the relationship between the claimant and the medical source, including the length, purpose, and extent of the treatment relationship, and the frequency of examinations. 20 C.F.R. § 404.1520c(c)(3)-(5). The ALJ "may" conclude that an examining medical source will understand the claimant's impairments better than a medical source who only reviews evidence in the claimant's file. 20 C.F.R. § 404.1520c(c)(3)(v). The ALJ also "will consider other factors that tend to support or contradict a medical opinion or prior administrative medical finding," including, but not limited to, "evidence showing a medical source has familiarity with the other evidence in the claim or an understanding of our disability program's policies and evidentiary requirements." 20 C.F.R. § 404.1520c(c)(5).

Dr. Kline completed a Mental Residual Functional Capacity Assessment form on July 9, 2019. Dr. Kline stated she had treated McNees since May 6, 2019, but Dr. Elton Hurst, a psychiatrist in Dr. Kline's practice group, had treated McNees four to five times a year since 2014. Dr. Kline assessed McNees as experiencing PTSD; major depressive disorder, recurrent, moderate; generalized anxiety disorder; agoraphobia with panic disorder; obsessive-compulsive disorder; and mild cognitive impairment. Her condition had improved minimally despite frequent visits. Chronic pain related to

9

interstitial cystitis, neck pain, back pain, hip pain, leg pain, and arm pain contributed to McNees's mental impairment, as medications and procedures did not adequately control her pain.

McNees underwent a psychiatric hospitalization after a suicide attempt in 2005, and she has attended therapy sessions and medication management appointment since that time.   Her impairments lasted, or could be expected to last, at least 12 months, and Dr. Kline did not characterize McNees as a malingerer.   McNees complied with mental health treatment, and she did not abuse drugs or alcohol.

In Dr. Kline's assessment of the category of understanding and memory, McNees experienced extreme limitations in remembering locations and work-like procedures, understanding and remembering very short and simple instructions, and understanding and remembering detailed instructions.

In the category of sustained concentration and persistence, McNees experienced moderate limitation in the ability to sustain an ordinary routine without special supervision.   She experienced marked limitations in the abilities to carry out very short and simple instructions and make simple work-related decisions.   She experienced extreme limitations in the abilities to carry out detailed instructions; maintain attention and concentration for extended periods; perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; work in coordination with or proximity to others without being distracted by them; and complete a normal

workday and workweek without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods.

In the category of social interaction, she experienced no limitation in the ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes.  She experienced mild limitations in the abilities to interact appropriately with the general public, ask simple questions or request assistance, maintain socially appropriate behavior, and adhere to basic standards of neatness and cleanliness.  She experienced marked limitation in the ability to accept instructions and respond appropriately to criticism from supervisors.

In the category of adaptation, McNees experienced no limitation in the ability to be aware of normal hazards and take appropriate precautions.  She experienced mild limitation in the ability to set realistic goals and make plans independently of others. She experienced marked limitation in the ability to respond appropriately to changes in the work setting.  She experienced extreme limitations of the abilities to travel in unfamiliar places, use public transportation, and tolerate normal levels of stress.

According to Dr. Kline, McNees's impairments would substantially interfere with her ability to work on a regular and sustained basis at least 20% of the time, and she would need to miss work more than six days each month.   Given her impairments, Dr. Kline opined McNees could not work on a regular and sustained basis.  (Tr. 2222-

24).   To explicate that finding, Kline stated:

> Mrs. McNees has severe panic attacks and agoraphobia.   She has no motivation or energy.   Low appetite. Can only sleep w/ Ambien. Sleep is often still disrupted.   She often feels hopeless & helpless. Isolates herself from others.   Fearful.   Extreme startle response.   Mood swings.   Cognitive impairment – recently she forgot how to make coffee and scramble eggs.   Forgetful.

(Tr. 2225).

Dr. Kline also added a handwritten note that is not entirely legible in the record, but it generally states that McNees needs to rest one to two days after driving due to the anxiety she bears.   She must constantly contemplate her extant and impending whereabouts.   These symptoms have taken a toll on her physically, and she must rest for a couple of days after her mental health appointments.   (*Id.*).   Dr. Kline stated McNees could not manage her own funds.   Her husband does not permit her to make purchases or pay bills because she cannot responsibly manage money.   She continues to make purchases even when the account does not contain sufficient funds.   She also displays hoarding behavior.   (*Id.*).

The ALJ did not find Kline's opinion persuasive.   He reasoned that Dr. Kline had only treated McNees for two months before rendering the opinion, though he acknowledged another provider in Dr. Kline's practice had treated McNees for years prior.   Based upon the ALJ's reasoning, "Dr. Kline ha[d] only established a brief treatment history with the claimant, and her opinions [were] not supported by the

12

record as a whole." (Tr. 29). The ALJ also observed that Dr. Kline appeared to rely primarily on McNees's subjective complaints instead of objective evidence. (*Id.*). Rather than adopting Dr. Kline's restrictive limitations, the ALJ found McNees experienced only moderate impairment of the abilities to understand, remember, and apply information; interact with others; concentrate, persist, and maintain pace; and adapt and manage herself. (Tr. 23-24). The ALJ accommodated those limitations by imposing restrictions on McNees's functioning in the RFC finding. (Tr. 25).

McNees asserts the ALJ mischaracterized the treatment history between her and Dr. Kline as brief, even though Dr. Kline treated McNees approximately 12 times before rendering her opinion. (Doc. 14, at 20).[3] But when compared to McNees's treating relationship with another psychologist in Dr. Kline's practice that persisted over several years, a 12-session treatment relationship over approximately two months reflects a comparatively brief counseling relationship.

McNees also disputes the ALJ's characterization of Kline's assessment as relying heavily on McNees's subjective complaints rather than on objective evidence, as Kline's "opinion is based on her own observations of" McNees, and there exists "no evidence to support the ALJ's contention that Dr. Kline's opinion is based upon subjective

---

[3] McNees apparently derives her estimate of a 12-session treating relationship between her and Kline from Kline's statement on the Mental Residual Functional Capacity Assessment form that she treated McNees weekly between May 6, 2019, and July 9, 2019. (Tr. 2222). The ALJ described the relationship as lasting "two months on a weekly basis," in contrast to McNees's history with another psychologist in the group, which had lasted several years. (Tr. 29).

complaints of the Plaintiff." (Doc. 14, at 20). However, the ALJ could reasonably construe Dr. Kline's description of McNees's limitations as resting upon McNees's subjective complaints rather than objective findings, as all of the factors Dr. Kline listed as affecting her determination represent problems a patient could self-report. (Tr. 2225). As the voluminous administrative record does not contain any of Dr. Kline's treatment notes from the relevant period (May 6-July 9, 2019), McNees has presented no evidence to contradict the ALJ's observation that Dr. Kline based her assessments on McNees's subjective complaints. *See Washington*, 906 F.3d at 1359 (claimant bears the burden of proving disability); *Hethcox v. Comm'r of Soc. Sec.*, 638 F. App'x 833, 835 (11th Cir. 2015); 20 C.F.R. §§ 404.1512(a), 416.912(a).

Finally, McNees asserts the ALJ did not adequately explain his reason for finding Dr. Kline's opinion unpersuasive. However, pursuant to the revised regulations, the ALJ appropriately considered Dr. Kline's treatment relationship with McNees, the supportability of Dr. Kline's assessments by objective medical evidence, and he adequately articulated the reasons behind the decision by describing the history of McNees's treatment with Dr. Kline and discussing the record evidence regarding McNees's mental condition, albeit not in the same section of the opinion in which he rendered the finding about Dr. Kline's assessment. As the following analysis portrays, substantial evidence underlies the ALJ's conclusion that the record as a whole did not support Dr. Kline's assessments of disabling limitations.

14

McNees's mental health treatment records from Grayson and Associates, Dr. Kline's practice group, do not support any greater psychological impairments than those assessed by the ALJ.   McNees visited the practice on February 21, June 23, and October 20, 2017 (Tr. 751-55), then she did not return to the office until October 18, 2018.   On that date, she presented for continued psychiatric care for recurrent major depressive disorder, generalized anxiety disorder, panic disorder with agoraphobia, and mild cognitive impairment.   She reported difficulty performing to her preferred standard at work, and she experienced significant stress when another employee straightened her files during her vacation leave.   She reported left and right cervical nerve root procedures notably reduced her neck and shoulder pian.   During the clinical examination, McNees displayed normal gait and stance, full orientation, fluent speech, concerned mood, congruent affect, no suicidal or homicidal ideation, no hallucinations or delusions, intact judgment, fair insight, reality-based thought content, goal-directed thought process, and no abnormal voluntary movements.   Psychiatrist Elton Hurst continued McNees's medications.   (Tr. 748-50).

On January 31, 2019, McNees received treatment for the same conditions.   She reported she retired from her job in December 2018, and now she "has 'too much time to think.'"   She feels anxious and ambivalent, freezes when faced with choices, displays outbursts of emotion, and could no longer deal with the stresses of her job.   The

clinical examination produced the same findings as the previous visit.   Dr. Hurst continued McNees's medications.   (Tr. 745-47).

Matthew D. Thompson, Psy.D., a clinical neuropsychologist at Grayson and Associates, conducted a neuropsychological evaluation on September 18, 2019, to assess McNees's cognitive functioning.   She reported her physical status had improved since she ceased working, yet she continued to experience forgetfulness.   She spends most of her time at home, but she manages her daily living activities independently. (Tr. 2228-30).   Dr. Thompson administered neuropsychological testing, which

> revealed an average level of overall intellectual function.   Concerning more specific neuropsychological functions, she had mild difficulty on a measure of sustained attention and concentration.   Her overall performance across multiple measures of memory ranged from the low average to high average range, with her overall performance in the average range.   She had mild difficulty on a measure of rapid cognitive flexibility and response inhibition (components of executive function). Concerning emotional and behavioral functioning, she has a long history of anxiety and depression but currently reports a fairly good mood and remains actively in treatment with a psychologist and psychiatrist.

(Tr. 2231).   Dr. Thompson did not detect any decline in McNees's intellectual function or memory since a previous assessment in 2014, but he did detect "a little more difficulty on measures of attention."   (Tr. 2231).   Dr. Thompson planned to meet with McNees to discuss strategies related to attention and "reassure her that her memory is normal for her age."   (Tr. 2232).

On February 17, 2020, McNees received treatment for the same conditions, plus obsessive-compulsive disorder.   She reported a recent fall that re-injured her back. During the clinical examination, McNees displayed normal gait and stance; full alertness and orientation; fluent speech; distraught, nervous, and troubled mood; congruent affect; no suicidal or homicidal ideation; no hallucinations or delusions; intact judgment; fair insight; reality-based thought content; goal-directed thought process; and no abnormal involuntary movements.   Dr. Hurst continued McNees's medications.   (Tr. 2383-85).

On April 6, 2020, McNees received continued treatment for the same conditions. The clinical examination produced the same findings as the previous visit.   Dr. Hurst prescribed an additional medication to assist with sleep.   (Tr. 2385-87).

On November 13, 2020, McNees received psychotherapy from Dr. Kline.   She reported decreasing her pain and anxiety medication dosages recently because she could not function with the previous doses.   She fell in her home in July, causing a wrist injury that has impaired her ability to pump hand soap or hold a cup of coffee.   She brushes her teeth 12 times a day, and odors cause her to vomit.   She reported receiving counseling since age seven.   She cannot drive due to physical pain, but even if she did not experience pain, her mental condition would prevent her from driving.   She experiences PTSD, and she responds to stressful events by running.   She tried to jump out of a car when she detected a crisis situation.   She feels terrified when she cannot

17

open containers or when she runs out of basic products like toilet paper, milk, and bread.   In such situations, her husband must leave work to calm her down.   She lost weight and muscle tone after her most recent fall.   She has always avoided eating, and she cannot follow recipes.   Her eyes experience such sensitivity that she must wear sunglasses while outside.   Odors render her dizzy and nauseated.   She feels helpless and displays very poor memory, sometimes mixing up her medications.   She has not opened her door in 20 years.   When someone rings her home's doorbell, she screams, runs, and hides.   She denied suicidal thoughts, but she did not sleep well, could not control her bladder or bowels, and feared a psychological addiction to pain medications. Dr. Kline assessed McNees's prognosis as poor. (Tr. 2738-39).

On November 17, 2020, McNees received continued treatment from Dr. Hurst for recurrent major depressive disorder, generalized anxiety disorder, panic disorder with agoraphobia, obsessive-compulsive disorder, and mild cognitive impairment.   Her husband expressed concern that she experienced a panic attack after reliving a past traumatic event.   She reported severe anxiety and panic with minimal provocation. She did not trust herself, but she denied suicidality.   She reported increased pain in her back, neck, and right wrist, and she experienced excruciating pain from interstitial cystitis.   During the clinical examination, McNees displayed baseline speech; serious, anxious, panic-stricken mood; feelings of guilt; no suicidal or homicidal ideation; no hallucinations or delusions; intact judgment; fair insight; reality-based thought content;

18

and goal-directed thought processes.   Dr. Hurst continued McNees's medications and recommended continued supportive therapy.   (Tr. 2735-37).

On November 25, 2020, McNees returned to Dr. Kline for psychotherapy.   She reported "things are not really going good," as she experienced daily struggles and out-of-control emotions.   She experiences significant physical pain, but her insurance would not cover an MRI, leaving her disheartened and discouraged.   As she described to Dr. Hurst, she reported experiencing a panic attack after a traumatic past event resurfaced.   Her broken wrist prevented her from everyday activities, and she cannot stay asleep because of bladder and muscle pain.   She planned a bladder surgery for December 4.   She eats one meal a day at most.   She deems herself at the mercy of others, as she cannot drive, buy anything, or receive medical care on her own.   She trembles constantly and cannot control her bladder.   She constantly worries about who will transport her to her medical appointments.   She alternates sitting, standing, and lying down until pain commences in each posture.   Her husband complained about increased responsibilities, and she feared he would reach his "breaking point."   She believes she has no hope of feeling better.   Dr. Kline assessed McNees's prognosis as poor.   (Tr. 2740-41).

On January 21, 2021, McNees returned to Dr. Hurst for continued treatment of the same conditions.   She reported developing severe anxiety and panic with minimal provocation.   Her husband denies her access to bank accounts.   She felt panic-

stricken about a small-claims court appearance in mid-February.   The clinical examination produced the same findings as the previous visit.   Dr. Hurst recommended continued psychotherapy with Dr. Kline.   (Tr. 2751-52).

These records reflect McNees did not receive extensive mental health treatment during the twelve-month period surrounding her alleged disability onset date, as she visited the clinic only on October 18, 2018, and January 31, 2019, and then underwent a neuropsychological assessment on September 18, 2019.   Though she reported significant symptoms of depression and anxiety, the clinical examinations and neuropsychological testing produced normal results.   The only negative clinical findings reflected defects in McNees's mood.   Though her mood regressed from a concerned deportment to distraught, nervous, and troubled bearings, those notations reflect McNees's self-reports, in addition to the examiner's clinical observations, which supports the ALJ's statement that negative assessments appeared to result from subjective self-reporting.

Notations about McNees's mental health in her other treatment records do not reflect the significant level of functional impairment assessed by Dr. Kline.

During regular visits to Alabama Pain Physicians between November 28, 2017, and March 20, 2019, McNees reported no psychiatric history and fair to good sleep and mood.   (Tr. 1778-79, 1798-99, 1815-17, 1831-33, 1853-54, 1895-j96, 1930-31, 1953-54, 1969, 2083, 2085).

20

During regular visits to Springville Family Care between May 24, 2018, and January 22, 2021, McNees reported that she experienced no depression, sleep disturbance, unsafe feelings, alcohol abuse, anxiety, hallucinations, suicidal thoughts, mood swings, memory loss, agitation, dementia, or delirium.  (Tr. 1994, 2000, 2004, 2010, 2013, 2965, 2970, 2978, 2985, 2990).   On April 24 and August 1, 2019, and January 28, 2020, she reported experiencing anxiety but no depression, sleep disturbance, unsafe feelings, alcohol abuse, hallucinations, suicidal thoughts, mood swings, memory loss, agitation, dementia, or delirium.  (Tr. 3000, 3008, 3012).   In addition, on August 1, 2019, she reported no suicidal ideation, and her depression did not interfere with her relationships or activities of daily living.   She experienced no life stressors, and she displayed no homicidal ideation, significant weight gain or loss, hallucinations, delusions, shortness of breath, anxiety, crying spells, panic, isolation, or apathy.   She displayed good mood, appetite, and energy.   She slept well and maintained her functionality.   (Tr. 3007).   On February 3, 2020, she reported depression, restless sleep, and anxiety, but she denied unsafe feelings, alcohol abuse, hallucinations, suicidal thoughts, mood swings, memory loss, agitation, dementia, and delirium.  (Tr. 2995).

On June 18, 2019, McNees presented to Birmingham Neurosurgery & Spine Group as alert and cooperative, with normal mood, affect, attention span, and concentration.   (Tr. 2823).

21

During regular visits to Birmingham Pain Center between February 13 and November 4, 2020, McNees presented as fully oriented and alert, with normal mood and affect, good judgment, and intact memory.  (Tr. 2505, 2515, 2524, 2531, 2542, 2552, 2559, 2569, 2620, 2630, 2644, 2660, 2670, 2681, 2695, 2705, 2757, 2763, 2768, 2775, 2782, 2788, 2795, 2800, 2807, 2908, 2913, 2920).

On July 22, 2020, when McNees visited the St. Vincent's East Emergency Department after breaking her wrist, she presented as calm and cooperative, with normal judgment and appropriate mood and affect.  She reported no anxiety or hallucinations.  (Tr. 2426, 2931, 2936).

During visits to Alabama Orthopaedic Surgeons on August 12 and November 11, 2020, McNees denied experiencing depression.   (Tr. 2453, 2456).

These records provide substantial evidentiary support for the ALJ's decision to disagree with Dr. Kline's assessment that McNees experienced severe anxiety, sleep and mood disturbances, and cognitive impairment.  (Tr. 2225).  Though McNees exhibits a long history of treatment for anxiety and depression, the record does not substantially support the existence of any functional mental impairments greater than those the ALJ gauged in his RFC finding.  The mere presence of depression and anxiety does not support a finding of disability, as the functional effect of a claimant's impairments and symptoms governs disability determination.  *Moore,* 405 F.3d at 1213 n.6 (citing *McCruter v. Bowen*, 791 F.2d 1544, 1547 (11th Cir. 1986)) ("To a large extent, Moore

22

questions the ALJ's RFC determination based solely on the fact that she *has* varus leg instability and shoulder separation.   However, the mere existence of these impairments does not reveal the extent to which they limit her ability to work or undermine the ALJ's determination in that regard."); *Mansfield v. Astrue*, 395 F. App'x 528, 531 (11th Cir. 2010) (diagnosis insufficient to establish disability) (emphasis in original); *Osborn v. Barnhart*, 194 F. App'x 654, 667 (11th Cir. 2006) (While a doctor's letter reflected diagnoses, "it does not indicate in any way the limitations these diagnoses placed on [the claimant's] ability to work, a requisite to a finding of disability.").

Finally, the ALJ partially relied upon the opinion of the state agency medical examiner that McNees suffered no more than mild to moderate mental limitations, as he found that opinion "generally consistent with the evidence in the record."   (Tr. 29). The record, as discussed above, supports that conclusion.

In summary, the ALJ properly considered Dr. Kline's assessment pursuant to the revised regulations for evaluating medical opinions, focusing particularly on the supportability and consistency of the assessment.   Moreover, substantial evidence, as fully discussed in this section, supported the ALJ's finding.

## II.    The ALJ Properly Evaluated McNees's Subjective Symptoms

McNees also asserts the ALJ improperly evaluated her complaints of pain and other subjective symptoms.

A three-part "pain standard" applies when a claimant attempts to

23

> establish disability through her own testimony of pain or other subjective symptoms. *Wilson*[ *v. Barnhart*], 284 F.3d [1219,] 1225[ (11ᵗʰ Cir. 2002)]. The pain standard requires evidence of an underlying medical condition and either objective medical evidence that confirms the severity of the alleged pain arising from that condition or a showing that the objectively determined medical condition is of such severity that it can be reasonably expected to give rise to the alleged pain. *Id.*

*Porto v. Acting Comm'r of Soc. Sec. Admin.*, 851 F. App'x 142, 148 (11ᵗʰ Cir. 2021). A claimant's testimony coupled with evidence that meets this standard suffice "to support a finding of disability." *Holt v. Sullivan*, 921 F.2d 1221, 1223 (11ᵗʰ Cir. 1991) (citation omitted).

Social Security Ruling ("SSR") 16-3p mandates the ALJ "will consider any personal observations of the individual in terms of how consistent those observations are with the individual's statements about his or her symptoms as well as with all of the evidence in the file." SSR 16-3p, 2016 WL 1119029, *7 (Mar. 16, 2016). An ALJ rendering findings regarding a claimant's subjective symptoms may consider a variety of factors, including: the claimant's daily activities; symptom location, duration, frequency, and intensity; precipitating and aggravating factors; type, dosage, effectiveness, and side effects of medication taken to alleviate the symptoms; and other factors concerning functional limitations and restrictions due to symptoms. *See* 20 C.F.R. §§ 404.1529(c)(3), (4).

SSR 16-3p further explains that the ALJ's decision "must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by

the evidence, and be clearly articulated so the individual and any subsequent review can assess how the adjudicator evaluated the individual's symptoms."   2016 WL 1119029 at *9; *see also Wilson*, 284 F.3d at 1225 (If an ALJ discredits a claimant's subjective testimony, the ALJ "must articulate explicit and adequate reasons for doing so.").

During the first administrative hearing, McNees testified her cervical spine symptoms prevent her from using her hands to manipulate a pump and dry her hair, and push, pull, and turn her head certain ways.   She cannot do laundry, dishes, or gardening, and she can cook only simple, light items such as scrambled eggs.   She can only drive six miles to her necessary medical appointments; otherwise, she avoids driving.   She experiences constant pain that any level of activity exacerbates to the point she needs multiple days to recover.   Medication does not completely relieve her pain, but it does help her focus less on the pain.   Injections did not provide her relief, but nerve ablations have provided temporary relief.   She lacks sufficient strength to lift kitchen pans and baskets of laundry, and if she attempts to lift such items, she suffers ill effects for days.   She lacks manual dexterity to fasten jewelry, hold a cotton swab, shave, and apply makeup.   She often drops items like cups.   (Tr. 74-79).   Counseling and medication have proven extremely helpful for her mental health symptoms, though her medications sometimes cause sleepiness.   (Tr. 83-84).   Her recurrent urinary tract infections also cause constant pain and frequent urination.   Her bladder feels heavy, and she always needs to stay near a restroom.   (Tr. 86).

During the second administrative hearing, McNees testified multiple back surgeries had not resolved her issues. She "constantly" visits the toilet. (Tr. 48). Her anxiety causes her to avoid public places, and she had not opened her home's door for 20 years. She excessively brushes her teeth. The day before the hearing, she felt "frozen and nervous and dizzy" from anxiety. (*Id.*). When she worked, she often called in sick, and she took frequent pain breaks while in the office. She stopped working after she "lost all optimism," as her responsibilities continued to increase when she demonstrated good job performance. She felt frustrated that she received a lower Christmas bonus than in previous years. She "was having to take all these medicines just to stay" at work, which allowed her to be "in the moment for work" but not "in the moment for other aspects of life." (Tr. 49-50). She became more reclusive after the first hearing, because she could not speak coherently to other people, needed to repeat herself often, could not remember recent discussions, and suffered an increasing number of falls. (Tr. 52-53).

The ALJ found McNees's medically determinable impairments could reasonably be expected to cause her alleged symptoms, but McNees's statements concerning the intensity, persistence, and limiting effects of her symptoms were not entirely consistent with the medical and other evidence. (Tr. 25). The ALJ stated he limited McNees to work at the light level of exertion because limiting the weight she could lift and/or carry and the amount of time she could stand and/or walk "would significantly minimize any

stress placed on the claimant's musculoskeletal system." (Tr. 28). He characterized the RFC finding as "supported by the medical record as a whole," and he concluded "claimant's alleged inability to perform substantial gainful activity is not corroborated by the preponderance of the evidence." (Tr. 30). He "considered the evidence including the claimant's subjective allegations, as well as third-party evidence," and he found "the claimant simply alleges a greater degree of debilitation than what the objective medical evidence supports. (*Id.*).

The ALJ appropriately considered the consistency of Waldrop's subjective complaints with the objective medical evidence. *See* 20 C.F.R. §§ 404.1529(c)(3), (4); SSR 16-3p, 2016 WL 1119029, at *7. In addition, though the ALJ revealed a simple, straightforward reason for the weight he afforded McNees's subjective symptoms – *i.e.*, their inconsistency with the medical evidence – he articulated that reason sufficiently to provide for meaningful review. *See id.* at *9. Thus, the ALJ properly applied the Eleventh Circuit's pain standard and SSR 16-3p.

However, McNees asserts substantial evidence does not support the ALJ's decision as the ALJ "relied upon isolated treatment" and "ignored, overlooked and mischaracterized parts of [the] medical record." (Doc. 14, at 8).

As to McNees's allegations of disabling mental health symptoms, her argument does not succeed for the reasons discussed in the previous section addressing the ALJ's consideration of Dr. Kline's mental function assessment. To reiterate, though McNees

suffered symptoms of anxiety and depression, substantial evidence supports the ALJ's finding that McNees experiences no more than moderate mental limitations.

As to McNees's allegations of disabling spinal symptoms, she asserts the ALJ overlooked objective imaging results and a long history of treatment for pain that support her alleged limitations.   However, as reviewed below, substantial record evidence does not support that assertion.

On June 28, 2019, a cervical spine MRI revealed no significant abnormalities in craniocervical junction, alignment, and visualized spinal cord.   The vertebrae demonstrated normal marrow signal and normal vertebral body height for McNees's age.   The imaging revealed no significant disc abnormality, spinal canal stenosis, or neural foraminal stenosis at C2-3; mild left foraminal narrowing, mild central disc bulge, and annular tear at C3-4, without significant developing spinal stenosis or interval change; fusion without significant recurrent spinal stenosis at C4-5; fusion with mild residual right-sided spondylosis and no significant stenosis at C5-6;[4]  continued mild left foraminal narrowing, central disc bulge, and annular tear effacing ventral subarachnoid space without cord compression at C6-7; mild central disc bulge without definite developing stenosis at C7-T1; and persistent central disc protrusion at T2-3 that slightly flattened the central cord.   The paraspinal soft tissues presented no significant

---

[4]  McNees underwent cervical fusion surgery in 2013 and a revision procedure in 2015.   (Tr. 71, 835-36).

abnormality.   (Tr. 2131-32).

On June 18, 2020, a cervical spine MRI revealed a broad-based central disc protrusion at T2-3, small right paracentral disc protrusion at T1-2, small central disc protrusion at C7-T1, mild symmetric diffuse disc bulging at C6-7 and C3-4, normal postoperative change at C5-6 and C4-5, and minimal diffuse disc bulging at C2-3.   The cranio-cervical junction demonstrated unremarkable results, the paraspinal soft tissues demonstrated no significant abnormality, and there existed no evidence of stenosis or nerve root compression.   (Tr. 2470-71).

On June 28, 2019, a thoracic spine MRI revealed normal thoracic kyphosis without significant scoliosis, no significant visualized spinal cord abnormality, and normal marrow signal and vertebral body height for McNees's age.   The scan detected a broad-based right paracentral disc protrusion at T2-3 which minimally flattens the right ventral cord, patent neural foramen, slight central disc bulge at T5-6 without significant stenosis, right paracentral disc protrusion at T6-7 that slightly deforms the right ventral cord, mild end plate changes anteriorly at T7-8 with mild right-sided disc bulge but no significant stenosis, mild facet joint hypertrophy at T9-T10 without stenosis or foraminal narrowing, and mild degenerative endplate changes at T10-11 and T11-12 without significant stenosis.   (Tr. 2129-30).

On June 18, 2020, another thoracic spine MRI revealed no significant developing spondylolisthesis; continued multilevel degenerative disc changes at T9-10 and T10-11,

but no significant edema or evidence of acute compression fracture; persistent broad-based right disc protrusion at T2-3 which mildly deforms the right ventral cord, but no evidence of decreased spinal cord signal intensity; right paracentral disc protrusion at T6-7 that mildly deforms the right ventral cord; and slight disc bulges at T5-6, T10-11, and T11-12 without significant stenosis.   The paraspinal soft tissues demonstrated no significant abnormality.   (Tr. 2478-79).

On June 17, 2019, a lumbar spine MRI revealed transitional vertebrae at L5-S1, slight retrolisthesis at L5-S1 with mild disc desiccation, normal marrow signal, and normal vertebral body height for McNees's age.   There existed no significant abnormalities at L1-2, L2-3, L3-4, and L4-5.   At L5-S1, a broad-based right lateral disc protrusion and annular tear at L5-S1 effaced the right recess and mildly displaced the descending right S1 nerve root.   The L5-S1 findings mildly progressed from a previous scan in 2017, and they extended into the proximal right neural foramen with mild narrowing.   However, there existed no significant foraminal narrowing on the left. The MRI also detected a slight disc bulge and mild degenerative endplate changes at T12-L1.   (Tr. 2856).

On June 18, 2020, a lumbar spine MRI revealed continued minimal retrolisthesis at L4-5 with disc desiccation but no significant developing lumbar scoliosis, transitional vertebrae at L5-S1 but no significant edema in the vertebral bodies, persistent mild bulge at T12-L1, slight bulge at T11-12, and appropriate signal intensity at the distal

spinal cord.  The spine displayed no significant abnormalities at L1-2, L2-3, or L-3-4, or in the paraspinal soft tissues.  At L4-5, there existed minimal disc bulge without significant developing spinal stenosis or foraminal narrowing, and at L5-1, persistent right lateral disc protrusion effaced the right lateral recess and displaced the descending right S1 nerve root sheath.  The L5-S1 condition caused continued mild right neural foraminal narrowing, and it appeared to have mildly progressed from the previous examination.  (Tr. 2476-77).

Contrary to McNees's assertion, the ALJ considered all of these MRI results. (Tr. 26-27).  Moreover, the MRI results do not substantially support McNees's alleged level of impairment from spinal symptoms.  The cervical spine MRIs reflect only minimal or mild findings, normal post-operative changes, and age-appropriate vertebral body height.  Similarly, the thoracic MRIs reflect some disc abnormalities but only slight, minimal, mild, or insignificant effects on the spinal cord itself, and otherwise age-appropriate degenerative changes.  The lumbar MRIs demonstrate that McNees suffered some abnormalities that progressed over time.  However, despite the progression, McNees experienced only mild disc desiccation, age-appropriate vertebral body height, mild nerve displacement, mild foraminal narrowing, mild or slight disc bulges, mild degenerative changes, and no stenosis.  None of these objective findings, whether considered singly or in combination, substantially undermine the ALJ's finding that McNees could perform a limited range of work despite her spine condition.

31

As further objections, McNees asserts the ALJ failed to consider her "longstanding history of severe physical impairments requiring physical therapy, multiple surgical procedures, pain management and narcotic pain medication." (Doc. 14, at 9). However, in the administrative decision, the ALJ provided a detailed discussion of McNees's treatment history for pain, including all those interventions.

The ALJ observed that McNees benefitted from physical therapy for neck and back pain. (Tr. 26). McNees's physical therapy records support that statement. During a February 14, 2018, visit to E.W. Motion Therapy, she reported moderate neck pain and headaches, difficulty concentrating, inability to drive, and slightly disturbed sleep. (Tr. 770, 810). During the course of treatment through June 18, 2018, she reported decreased pain that she could self-manage, and she "feels good" about her progress. (Tr. 766-69). When she recommenced treatment in February 2019, she reported significant pain, but she demonstrated normal range of motion in all areas of her cervical and lumbar spine other than decreased left lateral flexion. (Tr. 759-60).

McNees also obtained physical therapy from OrthoSports Associates between February 25, 2021, and March 10, 2021. On February 25, 2021, she reported she responded positively to prior therapy. She characterized her current lumbar pain level as a six of ten, with level nine pain at her worst. The clinical examination produced no tenderness or spasm, intact sensation, normal gait and station, ambulation without assistance, 50% back range of motion, and at least 4/5 lower extremity strength. (Tr.

32

3020-21).   She characterized her current wrist pain level as two of ten, with level eight pain at her worst.   She experienced disturbed sleep and difficulty gripping and fastening objects; performing housework; opening containers; and lifting, pushing, pulling, and manipulating objects.   The clinical examination produced intact sensation, reduced range of motion, and no evidence of tenderness.   (Tr. 3026-27).

On March 1, 2021, she continued to report level two wrist pain.   (Tr. 3037-42). She reported level two lumbar pain that reduced to level one after clinical treatment, though bladder pain from a recent surgery caused some limitations.   (Tr. 3043-44). On March 3, 2021, she described level two wrist pain both before and after clinical treatment.   (Tr. 3045-50).   She described zero lumbar pain, and the limitations from the bladder pain had decreased.   (Tr. 3051-52).   On March 8, 2021, she reported level two wrist pain both before and after treatment, and she demonstrated an excellent response to treatment.   (Tr. 3053-58).   On March 10, 2021, her wrist pain had increased to level four, and she asked to take a break from therapy because it increased her pain and caused her to feel more anxious.   She believed she had regressed overall. (Tr. 3059-65).

These records demonstrate not only that physical therapy tended to produce positive results for McNees, but also that she never described more than moderate pain to her physical therapists, and the physical therapy records do not document significant functional limitations.

33

The ALJ also properly considered that McNees's treatment notes from Springville Primary Care reflect unremarkable physical examinations and adequate toleration of her medication with no adverse effects. (Tr. 27). Those records – which range from January 1, 2018, to January 22, 2021 – consistently include clinical findings of normal gait and station, intact sensation, normal extremity movement, and normal neck and back. (Tr. 1994, 2000, 2004-05, 2010-11, 2013-14, 2965, 2970, 2986, 2995-96, 3004, 3008, 3012-13). On January 28, 2020, the examination elicited tenderness in the neck and back. (Tr. 3000). During the July 27, 2020, examination, shortly after McNees broke her wrist, the examination included limited range of motion, bony deformity, and swelling in the right forearm and hand (Tr. 2978), but those symptoms did not persist as acutely after McNees healed from the fracture.

McNees also asserts the ALJ selectively considered her treatment notes from Alabama Orthopaedic Surgeons by focusing only on positive findings. During her first examination on August 12, 2020, McNees reported some discomfort with cervical and lumbar range of motion, but she ambulated without evidence of ataxia or guarding, and she displayed full motor strength and intact sensation. The doctor did not detect any abnormalities that caused significant concern, and he opted to give McNees's condition time to improve. (Tr. 2455-57). The November 5, 2020, examination produced similar results, except that McNees presented only 4/5 motor strength that gave way with manual motor testing. (Tr. 2452-54). The ALJ accurately described these

34

findings (Tr. 27), and none of them support a more significant level of functional impairment than the ALJ assessed.

The record substantiates McNees's consistent complaints of bladder pain and urgency, but it also reflects she received good results from treatment, and it does not contain any evidence of functional limitations.   On March 16, 2020, Birmingham Pain Clinic administered a hypogastric plexus block for pelvic pain, and McNees reported the procedure improved her pelvic pain somewhat.   (Tr. 2356, 2773).   During a November 16, 2020, visit to Dr. Scott Kelly, a urologist, McNees reported "miserable, pelvic myalgia" and trouble sitting for long intervals. (Tr. 2749).[5]

---

[5] On April 20, 2020, Dr. Kelly provided a letter stating McNees suffered from interstitial cystitis with disabling symptoms; failed surgical interventions, intravesical and oral medications, and dietary restrictions; hyperreflexic bladder dysfunction; disabling urgency, urinary frequency, and urgency incontinence; sleep deprivation due to continual nighttime voiding; chronic pelvic myalgia and pelvic pain; and kidney stone disease, among other conditions.   He stated McNees's

> chronic pain from interstitial cystitis prevents her from concentrating in any work environment.   It interrupts all activities of daily living.   Continual bladder pain and urinary frequency requires she be in the bathroom on an extremely frequent basis, preventing her from maintaining any employment.   Her neurogenic bladder dysfunction worsens the existing interstitial cystitis symptoms.   The neurogenic bladder also causes worsening frequency and repeated urinary incontinence during any workday.   Despite my efforts, she has failed surgical intervention, including hydrodistention's and cauterizations, intravesical bladder medication therapy, oral medication therapies, and dietary restrictions.   She continues to have difficulty despite a referral to pain management physicians.   She is now taking 14 different medications, and continues to have disabling symptoms.

> In summary, I cannot imagine with her pain and urinary symptoms that she could be functional in any work environment.

(Tr. 2390-91).   The ALJ acknowledged Dr. Kelly's letter, but he afforded it no weight as Dr. Kelly did not provide functional limitations, and the Commissioner, not a medical provider, determines a

On December 4, 2020, she reported bladder inflammation, waking at night with bladder pain, and increased bladder spasms and urgency.   She underwent a cystoscopy and bladder trigone cauterization, hydrodistention, urethral dilation, and steroid injection.  (Tr. 2747).   The administrative record does not contain any records from treatment by Dr. Kelly after those procedures, but McNees testified during the second administrative hearing that her urinary urgency and frequency persisted.  (Tr. 49). However, despite those complaints, a January 26, 2021, abdominal ultrasound produced normal findings.  (Tr. 2940-41).   And, as discussed above, McNees stated during a March 3, 2021, physical therapy session that her limitations from bladder pain had decreased.  (Tr. 3051-52).   Absent any objective evidence revealing persistent, long-term functional limitations, McNees's subjective complaints of bladder pain, urinary frequency, and other bladder symptoms do not undermine the substantial evidence supporting the ALJ's decision to impose less significant limitations than McNees self-reported.

Other records reflect McNees's long history of treatment for vertebral, wrist, and bladder pain, including with surgery, nerve blocks, injections, and medication management.   However, as with McNees's mental health symptoms, neither the mere

---

claimant's ability to work.   20 C.F.R. § 404.1520b(c)(3)(1); *Walker v. Soc. Sec. Admin., Comm'r*, 987 F.3d 1333, 1338-39 (11th Cir. 2021).   McNees did not challenge the ALJ's consideration of Dr. Kelly's letter on appeal.

existence of pain nor the treatment she received for it provides substantial evidentiary support for a disability finding.   *See Moore,* 405 F.3d at 1213 n.6 (citing *McCruter,* 791 F.2d at 1547); *Mansfield,* 395 F. App'x at 531; *Osborn,* 194 F. App'x at 667.   Rather, most of McNees's arguments for reversing the ALJ's decision consist of disagreements with how the ALJ weighed the facts and medical opinions.   But the court "may not decide the facts anew, reweigh the evidence, or substitute [its] judgment" for that of the ALJ. *Winschel,* 631 F.3d at 1178; *see also Werner v. Comm'r of Soc. Sec.,* 421 F. App'x 935, 939 (11th Cir. 2011) ("The question is not . . . whether [the] ALJ could have reasonably credited [the claimant's] testimony, but whether the ALJ was clearly wrong to discredit it.").

Finally, in addition to the medical evidence previously discussed, the ALJ partially relied upon the opinion of the state agency medical examiner that McNees could perform a range of light work with additional non-exertional limitations, as he found that opinion "generally consistent with the evidence in the record."   (Tr. 29).   The ALJ's RFC finding reflects at minimum the limitations the state agency examiner imposed (Tr. 24-25, 111-13), and as reflected, substantial evidence supports that finding.

In summary, as McNees has not offered any argument or pointed to any facts that undermine the substantial evidence supporting the ALJ's decision, the court will not disturb the ALJ's findings regarding the extent of her limitation from subjective

symptoms.

## CONCLUSION

For the foregoing reasons, the court **AFFIRMS** the Commissioner's decision.

The court will enter a separate final judgment.

**DONE** this 15th day of March, 2023.

_____
HERMAN N. JOHNSON, JR.
UNITED STATES MAGISTRATE JUDGE